# UNITED STATES DISTRICT COURT

_____SOUTHERN_____ DISTRICT OF _____TEXAS_____

UNITED STATES OF AMERICA
V.
Mohammed Abdulazz Al-Zehairi

JUN 2 6 2009
Clerk of Court

**CRIMINAL COMPLAINT**

Case Number: H-09-505M

**UnSealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

(Name and Address of Defendant)

I, the undersigned complainant, state that the following is true and correct to the best of my knowledge and belief. On or about January 12, 2002 (Date) _____ within the jurisdiction of the Southern District of Texas the defendant did

knowingly possess, use, obtain or caused to be obtained a United States Visa for a domestic employee knowing the United States Visa was procured by means of a false statement or fraud

in violation of Title __18__ United States Code, Section(s) __1546(a)__.

I further state that I am a(n) __Special Agent__ and that this complaint is based on the
                                    Official Title
facts related in the affidavit attached hereto and made a part of this complaint.

See Attached Affidavit.

_____
Signature of Complainant

Bryan P. Hykes
Printed Name of Complainant

Sworn to before me and signed in my presence,

June 26, 2009                                       at    Houston, Texas
Date                                                      City and State

Frances H Stacy, US Magistrate Judge           _____
Name and Title of Judicial Officer                Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT FOR

## Mohammed Abdulazz Al-Zehairi

I, Special Agent Bryan P. Hykes, being duly sworn, depose and state:

1. I am a Special Agent with the U.S. Department of State, Diplomatic Security Service, currently assigned to the Houston Field Office. I have been employed as a Special Agent since March 31, 2008. My duties include conducting passport and visa fraud investigations. I completed the Diplomatic Security Training Center's Basic Special Agent Course and the Federal Law Enforcement Training Center's Criminal Investigators Training Program where I received specialized training in conducting investigations of federal offenses, including passport fraud, visa fraud, and identity fraud.

2. This affidavit is filed in support of an arrest warrant and criminal complaint charging Mohammed AL-ZEHAIRI knowingly provided a false statement in securing a United States Visa for a domestic employee by knowingly violating the terms of the required employment contract used to secure a United States Visa in violation of Title 18 United States Code, Section 1546(a).

3. I have been personally involved in the investigation of this matter. This affidavit is based on information obtained from law enforcement and government personnel; my personal knowledge and observations; and my examination of various reports, documents, records, and computer databases. Unless otherwise indicated, when the contents of a document, or an individual's statement, are reported herein, they are reported in substance and part and are not intended to be a verbatim recitation of the document or statement. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of an arrest warrant, it does not include all of the facts known to me or other government personnel.

4. On January 12, 2002, Sriastutik SUKADI (hereby known as SUKADI) and Mohammed Abdulazz AL-ZEHAIRI (hereby known as SUBJECT) visited the U.S. Embassy in Riyadh, Saudi Arabia and submitted a B-1 "Domestic Employee" U.S. Visa application for entering the U.S. SUKADI and SUBJECT also turned in a document entitled "Employment Contract" (required for employment) and allegedly signed by both SUKADI and SUBJECT as part of the B-1 "Domestic Employee" U.S. Visa application process. On January 28, 2002, U.S. B-1 Non-Immigrant Visa (NIV Foil #44224156) was issued to Sriastutik Sumani Sukadi (SUKADI) based on the information and employment contract presented by SUBJECT and SUKADI. The employment contract is an agreement between the prospective employer and employee, which employer must adhere to certain specific guarantees, including, but not limited to: compensation at the prevailing wage, and accessibility of passport to the employee. In the employment contract signed by SUBJECT and SUKADI, and turned in with SUKADI's U.S. Visa application, the parties agreed to a basic monthly salary of $1,300 each month; establishment of work hours to be eight (8) hours a day, six days a week; and SUKADI's possession of her own passport during her stay in the United States. Without the contract indicating a fair wage comparable to that offered in the area of employment in the United States, the visa would not have been issued.

5. On October 17, 2007, Consul Alit SANTHIKA from the Indonesian Consulate in Houston, Texas contacted the Human Trafficking Rescue Alliance (HTRA) in regards to a call he had received from an Indonesian national residing in Houston. Consul SANTHIKA stated a female, who identified herself as Sriastutik SUKADI (SUKADI), was seeking help from the Indonesian Consulate. SUKADI identified her employer as Mohammed Abdulazz AL-ZEHAIRI (SUBJECT). In November of 2007, the U.S. Federal Bureau of Investigation (FBI), a member of the Human Trafficking Rescue Alliance (HTRA) opened a case

based on this lead. Subsequent investigation showed SUBJECT had submitted deferred action immigration papers on all family members and SUKADI.

6. On December 5, 2007, agents of the Human Trafficking Rescue Alliance (HTRA) interviewed SUBJECT at his place of residence (2700 Holly Hall St. #2690G, Houston, Texas). Agents found the Indonesian housemaid (SUKADI), separated her from the area, and she was interviewed by task force members and a representative from the Indonesian Consulate. SUKADI stated the SUBJECT permanently held her Indonesian Passport during the six years she worked as a domestic servant for the SUBJECT, and only released SUKADI's passport later during the day (12/05/2007) after being pressed by the task force agents. The affiant learned that the SUBJECT retrieved SUKADI's passport from a suitcase in the master bedroom in SUBJECT's residence which was normally kept locked with a combination lock. During the initial interview with the task force agents, SUKADI stated she expected to earn $1,200 U.S. dollars a month based on the agreement with her employer (SUBJECT) while working as a housemaid. SUKADI mentioned during her six years working for SUBJECT, she only received two payments of $200 each, with her family in Indonesia receiving cumulative payments once a year equivalent to $160 per month. At SUKADI's request, agents removed her from the residence. The Indonesian Consulate took custody of SUKADI and arranged for her temporary housing.

7. On December 12, 2007, SUKADI was interviewed for the second time by agents from the Human Trafficking Rescue Alliance (HTRA). SUKADI stated during her six years of employment with SUBJECT, she was never given her Indonesian Passport or allowed to travel. Beginning in 2004, SUKADI requested to return home on numerous times but was never granted permission. SUKADI indicated that beginning in 2006, after she pressured SUBJECT in returning home to Indonesia, SUBJECT began to stall with promises that her passport was being

processed or documents were being arranged so she could travel. By June 2007, when SUKADI again inquired about the whereabouts of her passport, she was told by SUBJECT's wife, HUDA (Huda Abdulrahman Al Wasel, hereafter known as HUDA) that she could leave but without her passport. SUKADI indicated she was hired on October 10, 2001 by the Al-Zehairi family in Saudi Arabia to work as a housemaid before coming to the U.S. Two months after she was hired, SUKADI stated she was told she would get paid $1,200 a month if she worked as a housemaid for SUBJECT in the U.S. SUKADI agreed and came to work for SUBJECT in February 2002. SUKADI inquired about her pay in June of 2002 after four months of working for SUBJECT in Houston without pay. SUKADI was told she would get paid only after her first two years of work were complete. SUKADI did not agree to this change, but out of fear of physical harm by SUBJECT, she continued to work. In 2004, after two years of full-time work for SUBJECT, her family in Indonesia was wired a payment of $1,920 for her work during her first two years working for SUBJECT. This amount was equivalent to $160 per month for only one year of work. Annual payments were then subsequently made to SUKADI's family in Indonesia in amounts equivalent of $160 or less per month. SUKADI mentioned during her first seventeen months of employment, she was not allowed to talk to her family in Indonesia. After repeated requests to go home, SUKADI was told by the SUBJECT no airline ticket was available for her to return to Indonesia.

8. On December 11, 2007 SUBJECT was interviewed at his residence located at 2700 Holly Hall, #2690G, Houston, Texas by members of the Human Trafficking Rescue Alliance. SUBJECT stated his family decided to temporarily move to the U.S. in 2001 to undergo cancer treatment for his wife (HUDA). SUBJECT mentioned he met SUKADI through an employment agency named ABUDAL HA HAMUDD in Saudi Arabia and began working as a housemaid with the family in the United States in early part of 2002. SUBJECT stated he signed a contract with the

employment agency but not with SUKADI. SUBJECT mentioned he arranged all of the travel documents, including SUKADI's U.S. Visa, at the U.S. Embassy in Riyadh. SUBJECT stated he paid for SUKADI's living expenses, including clothing, food, and calling cards, and treated SUKADI like a family member during her time working as a housemaid for him. SUBJECT said he was responsible for all of SUKADI's airline travel and monthly salary, in which he paid SUKADI a monthly sum of $180 per month. SUBJECT denied ever agreeing to pay SUKADI $1,200 a month. SUBJECT stated he did keep everyone's passports together for safekeeping, but mentioned SUKADI always had access to her Indonesian passport. SUBJECT stated SUKADI never asked him for her Indonesian passport.

9. On May 2, 2008, SUKADI was interviewed by members of the Human Trafficking Rescue Alliance (HTRA) agents. SUKADI re-iterated her earlier statements about not being allowed to travel home during her six years working for SUBJECT. SUKADI stated that in 2006, she was filled with disappointment because she had no choice other than to continue living in SUBJECT's house without being able to go home. SUKADI again re-stated that in June of 2007, HUDA told her she could travel but would do so without her Indonesian passport. SUKADI mentioned that she continued to ask SUBJECT and HUDA for permission to travel back home until she was rescued by the Human Trafficking Rescue Alliance (HTRA) in January of 2008. SUKADI stated the continued response from SUBJECT and HUDA was that her "papers" (Indonesian passport and travel documents) were not ready yet. SUKADI did not recognize the B-1 "Domestic Employee" U.S. Visa application (DS-156) nor the "employment contract" required for the visa, which were used to obtain her U.S. B-1 "domestic servant" Visa. SUKADI stated she does not recall signing any of these documents, nor any other documents while in Saudi Arabia. SUKADI mentioned the only time she recalls signing anything was in Indonesia at the employment agency while she was getting her Indonesian passport. SUKADI

mentioned that she remembers being taken by SUBJECT to an office building in Saudi Arabia (U.S. Embassy, Riyadh). SUBJECT told SUKADI they were going to this building so they can travel to the U.S. SUKADI stated she did not understand the language the SUBJECT was speaking to someone through a glass window (likely Arabic). SUKADI said she was told to sit and wait by SUBJECT and was not asked anything during the time inside the U.S. Embassy, Riyadh.

10. On June 6, 2008, SUKADI was interviewed by members of the Human Trafficking Rescue Alliance (HTRA). SUKADI provided details and examples of the relationship with the SUBJECT's family. SUKADI stated that after her arrival to the U.S. in 2002, SUKADI felt she could not talk to anyone, did not have any friends (in the U.S.), and her only interaction with other people was limited only to SUBJECT's family. SUKADI stated she was given a phone card in 2003 by HUDA but was told she could only call her family in Indonesia but no one else. During her six years of employment with SUBJECT, SUKADI stated she continually feared her employer (SUBJECT), based on comments she first heard from other housemaids working in Saudi Arabia (prior to coming to the U.S.), and from HUDA's attitude towards her.

11. On April 2, 2009, Diplomatic Security Service Special Agent Michael Chapple and I interviewed SUBJECT at the Department of State, Diplomatic Security (DS) Houston Field Office, located at 1919 Smith, Street, Ste. 2100, Houston, Texas. I asked SUBJECT if he recognized SUKADI's U.S. Visa application and the picture on the application. SUBJECT stated he did recognize the Visa application and picture as that of SUKADI, his former housemaid. SUBJECT stated SUKADI filled out the Visa application, not him. I then asked SUBJECT if he recognized the "employment contract" used to secure SUKADI's U.S. Visa, and if the signature on the contract was his own. SUBJECT stated he did recognize the contract and said the signature was in fact his own signature. I asked SUBJECT if he

was with SUKADI during the interview at the U.S. Embassy in Riyadh. SUBJECT stated he went to the U.S. Embassy but "waited outside in the car" while SUKADI submitted her U.S. Visa application and interview. SUBJECT again confirmed he was the sponsor for SUKADI's U.S. Visa. SUBJECT mentioned he was unsure which documents were required for SUKADI's U.S. Visa application. I asked SUBJECT about the details of the employment contract, including if he (SUBJECT) paid SUKADI the $1,300 monthly salary as stipulated in the employment contract. SUBJECT stated he did not pay SAKUDI the monthly sum of $1,300, but instead paid her $250 per month based "on another agreement", which he did not have but could get a copy from Saudi Arabia. I asked SUBJECT if SUKADI had access to her Indonesian passport. SUBJECT stated that all of the family's passports were kept together for safe-keeping, but mentioned SUKADI had "unlimited" access to her passport. RA asked SUBJECT if SUKADI asked to travel home. SUBJECT responded SUKADI never asked to travel back home (to Indonesia) and refused to travel.

12. On May 11, 2009 at 5:45pm, HTRA officer and I interviewed SUKADI at her residence in Houston, Texas. After introducing myself and telling her the purpose of the meeting, SUKADI agreed to go over her past interviews with HTRA about her experience during six years of working for SUBJECT in Houston. SUKADI stated she visited the U.S. Embassy in Riyadh with SUBJECT in person but did not speak with anyone or sign any documents. SUKADI said she was told she would be paid $1,200 if she worked for SUBJECT in the U.S. SUKADI again stated her family in Indonesia was wired payments of approximately $1,920 once year beginning her second year of full-time work for SUBJECT, which was equivalent to $160 per month. SUKADI stated she was never given any cash by SUBJECT save for only two occasions: $25 dollars during Ramadan in 2006, and $75 during Ramadan in 2007. SUKADI re-stated she was never given access to her Indonesian passport during her six years working for

SUBJECT. SUKADI said she had knowledge her passport was kept in a locked suitcase inside a closet in the SUBJECT's residence. SUKADI said her typical day of work usually started when the first daughter woke-up in the morning, usually about 6am, and would end sometimes until 1am. SUKADI stated during her six years of employment for SUBJECT, she was never given any vacation days or personal time-off.

13. Based on the above information, I have probable cause to believe that Mohammed Abdulazz Al-Zehairi has violated Title 18 United States Code, Section 1546(a), "Fraud and Misuse of Visas, Permits, and other documents". Al-Zehairi knowingly provided a false statement in securing a United States Visa for a domestic employee by knowingly violating the terms of the required employment contract used to secure a United States Visa in violation of Title 18 United States Code, Section 1546(a).

Bryan P. Hykes, Special Agent
United States Department of State
Diplomatic Security Service

Subscribed and sworn before me this 26 day of June, 2009.

United States Magistrate Judge